# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GEMS TV (USA) LIMITED[1] | Case No. 10-11158 (PJW) |
| Debtor. | **Bid Procedures Hearing Date:  May 5, 2010 at 4:00 p.m. (ET)**<br>**Bid Procedures Objection Deadline:  May 3, 2010 at 12:00 NOON (ET)**<br>**Sale Hearing Date:  May 19, 2010 at 4:00 p.m. (ET)**<br>**Sale Objection Deadline:  May 17, 2010 at 12:00 NOON (ET)** |

## DEBTOR'S MOTION FOR ORDERS:
## (A)(I) APPROVING BID PROCEDURES RELATING TO SALE OF THE DEBTOR'S NON-INVENTORY ASSETS; (II) SCHEDULING A HEARING TO CONSIDER THE SALE; (III) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION; (IV) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; AND (V) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF NON-INVENTORY ASSETS  OUTSIDE THE ORDINARY COURSE OF BUSINESS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION AND SALE AND ASSIGNMENT OF THE PURCHASED CONTRACTS; <u>AND (IV) GRANTING RELATED RELIEF</u>

Gems TV (USA) Limited, as debtor and debtor-in-possession herein (the "<u>Debtor</u>"), hereby moves this Court, pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et seq</u>. (the "<u>Bankruptcy Code</u>"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for entry of two orders:  (a) the first order, substantially in the form annexed hereto as <u>Exhibit A</u> (the "<u>Bid Procedures Order</u>"), (i) approving the procedures (the "<u>Bid Procedures</u>") substantially in the form annexed hereto as <u>Exhibit B</u>, including the Stalking Horse Protections as set forth below and in the asset purchase agreement (the "<u>APA</u>") between the Debtor and Zalemark Holding Company, Inc. (the "<u>Stalking Horse Bidder</u>"), with respect to the proposed sale (the "<u>Sale</u>") of substantially all of the Debtor's non-inventory assets (as discussed in greater detail below, the

---

[1]  The last four digits of the Debtor's federal tax identification number are 9452.  The address for the Debtor is 1190 Trademark Dr., Suite 107, Reno, NV 89521.

"Acquired Assets"), (ii) scheduling a hearing (the "Sale Hearing") on the Sale and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of an auction for the Acquired Assets (the "Auction"), (iv) establishing procedures to determine cure amounts and deadlines for objections for certain contracts and leases to be assumed and assigned by the Debtor (the "Purchased Contracts"), and (v) granting related relief; and (b) the second order (the "Sale Order") substantially in the form annexed hereto as Exhibit C (i) authorizing the Sale free and clear of liens, claims, encumbrances, and interests pursuant to the APA, a copy of which is attached hereto as Exhibit D, (ii) authorizing and approving the APA, (iii) authorizing the assumption and sale of the Purchased Contracts, and (iv) granting related relief.

## BACKGROUND AND JURISDICTION

1. On April 5, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. No trustee or examiner has been appointed in the Debtor's chapter 11 case. On April 22, 2010, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").

3. Formed in November 2006, the Debtor is a U.S. retailer of genuine colored gemstone jewelry. The Debtor historically derived revenue from sales made either through its 24/7 home shopping channel, GemsTV, which reaches approximately 37 million viewers through satellite television providers, DirecTV, Inc. and Dish Network, and select cable markets, or its internet-based storefront www.gemstv.com. Additional information about the

DB02:9498035.4                                                                                       069355.1001

Debtor's business, the events leading up to the Petition Date and the facts and circumstances surrounding the Debtor and this chapter 11 case can be found in the Declaration of Diane Schneiderjohn in Support of Chapter 11 Petition and First Day Relief [Docket No. 3], which is incorporated herein by reference as if fully set forth herein.

4.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code, along with Bankruptcy Rules 2002, 6004, 6006, and 9014.

**Relief Requested**

5.      By this Motion, the Debtor seeks the entry of two orders of this Court: (a) the Bid Procedures Order (i) approving the Bid Procedures, including the Stalking Horse Protections, with respect to the Sale of the Acquired Assets, (ii) scheduling the Sale Hearing and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of the Auction, (iv) establishing procedures to determine cure amounts and deadlines for objections for the Purchased Contracts, and (v) granting related relief; and (b) the Sale Order (i) authorizing the Sale free and clear of liens, claims, encumbrances, and interests, pursuant to the APA, (ii) authorizing and approving the APA, (iii) authorizing the assumption and assignment of the Purchased Contracts, and (iv) granting related relief.

**The Proposed Sale of the Debtor's Non-Inventory Assets**

6.      Since the Petition Date, the Debtor has worked tirelessly to wind down its operations and liquidating its remaining inventory. Indeed, as of the filing of this Motion, because of the tremendous commitment demonstrated by the Debtor's employees, the Debtor has less than $5.0 million in remaining inventory. The Debtor and its professionals are currently

3

marketing the inventory and evaluating potential avenues of disposition to determine the appropriate liquidation scenario after its operations are terminated.

7.      In addition to the Inventory, the Debtor has certain other assets that were used in the ordinary course of operations, and which the Stalking Horse Bidder seeks to purchase in accordance with the APA. These assets include, but are not limited to: (i) the Debtor's non-proprietary software; (ii) all trademarks belong to the Debtor, other than the mark "GemsTV"; (iii) the Debtor's existing customer list on a non-exclusive basis; (iv) phone numbers; and (v) all other assets used by the Debtor in the ordinary course of its business operations (collectively, the "Acquired Assets").

8.      On March 29, 2010, after certain preliminary discussions between the parties, the Stalking Horse Bidder submitted a letter of intent to the Debtor, which expressed an interest in acquiring the Acquired Assets upon the termination of the Debtor's affairs. Subsequent to the Petition Date, although the Debtor and its advisors continue to market the Acquired Assets to potential suitors, the Stalking Horse Bidder is the only entity that has submitted a definitive proposal for such assets to the Debtor.

9.      On April 28, 2010, the Debtor and the Stalking Horse Bidder entered into the APA, whereby the Stalking Horse Bidder agreed to, among other things, purchase the Acquired Assets for the aggregate purchase price of $3,717,362 (the "Purchase Price"). After the Debtor and its professionals examined the APA, they concluded that it provided a highly favorable outcome for the Debtor's estate and creditors. Importantly, the APA provides for the assumption of certain of the Debtor's liabilities and the possible maintainance of jobs for the Debtor's employees.

DB02:9498035.4                                                                                                    069355.1001

10. Time is of the essence with respect to the Sale, as the Stalking Horse Bidder has made it clear to the Debtor that unless the Sale is considered and approved by the Court in accordance with the milestones contained in the APA, it will likely be unwilling to consummate the transaction. The Debtor and the Stalking Horse Bidder agree that the timing of the Sale is critical, because each day that the Acquired Assets are subject to the uncertainty of the on-going wind-down process and the overhang of the Debtor's bankruptcy, the value of the Acquired Assets is likely to diminish. The Stalking Horse Bidder desires the rapid closure of the Sale because it hopes to utilize the Acquired Assets as part of a going-concern operation, taking advantage of, among other things, the Debtor's position in the marketplace and the institutional knowledge of the Debtor's employees. As time passes, both the Debtor's customers and employees are likely to move on, thereby reducing the return for the Acquired Assets to liquidation value, to the detriment of the Debtor's creditors.

## The Terms of the Proposed Sale

11. The following is a summary of the salient terms of the Sale set forth in the APA:[2]

| Purchase Price | Buyer shall pay to Seller aggregate consideration of Three Million Seven Hundred Seventeen Thousand Three Hundred Sixty Two dollars ($3,717,362). The Purchase Price shall be payable as follows: (a) on the Closing Date, Buyer's delivery to Seller, by wire transfer of immediately available funds, the amount of Two Million Nine Hundred Sixty Thousand Dollars ($2,960,000); and on the Closing Date, Buyer's assumption of the Assumed Liabilities, which Assumed Liabilities have an agreed value of Seven Hundred Fifty Seven Thousand Three Hundred Sixty Two Dollars ($757,362). |
|---|---|

---

[2] The terms of the APA are summarized here for the convenience of the Court and parties in interest. To the extent that there are any discrepancies between the actual terms of the APA and this summary, the terms of the APA shall govern. Capitalized terms used in this summary that are not defined herein shall have the meanings ascribed to them in the APA.

| | |
|---|---|
| **Closing** | The consummation of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at 10:00 a.m. Pacific time, at the offices of August Law Group, P.C., 19200 Von Karman Ave., Suite 900, Irvine, CA 92612, or at such other place as the Parties may mutually agree, within five (5) business days after the satisfaction or waiver of all conditions to Closing set forth in Section 8 and Section 9 of the APA. |
| **Assets to be Purchased** | All non-proprietary software; all trademarks belonging to Seller, other than the mark "GemsTV"; existing customer list – on a non-exclusive basis; all of Seller's right to any security deposit for the premises located at 1190 Trademark Drive, Reno, Nevada 89521-6001, in the amount of $379,500; and certain other assets included on the schedule of assets attached to the APA as provided by Seller as of the Closing Date. |
| **Assumed Liabilities** | The Lease Agreement, Transponder Services Agreement, certain Telecommunications Agreements, and certain Software License Agreements, all as set forth in the APA. |
| **Stalking Horse Protections** | A Breakup Fee in the amount of 112,000 (3% of the Purchase Price) and an Expense Reimbursement in an amount not to exceed $50,000. |

## **Proposed Bid Procedures**

12.     The Debtor desires to receive the greatest value for the Acquired Assets. Although the Debtor and its professionals have undertaken efforts to market the Acquired Assets, to reach a broader pool of possible purchasers and to seize on possible sale opportunities before any decline in value, the Debtor believes that it is imperative that they promptly move forward in the hope that higher and better offers are generated for the Acquired Assets. Accordingly, the Bid Procedures (as summarized below) were developed consistent with the Debtor's and the Stalking Horse Bidder's need to expedite the sale process, but with the objective of promoting

further active bidding that will result in the highest or otherwise best offer the marketplace can sustain for the Acquired Assets, while affording appropriate protection to the Stalking Horse Bidder. Moreover, the Bid Procedures reflect the Debtor's objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Acquired Assets by financially-capable, motivated bidders which are likely to close a sale transaction.

## A.    Bid Procedures

13.    Attached to this Motion are the proposed Bid Procedures.[3] Pursuant to Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (i) each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale; (ii) the Auction will be conducted openly and all creditors will be permitted to attend provided that advance written notice is given to the Notice Parties; and (iii) bidding at the Auction will be transcribed or videotaped. The Bid Procedures are typical for asset sales of this size and nature, include provisions for consultation with the Committee, and require a deposit and that a bidder be a "Qualified Bidder," as defined in the Bid Procedures.

14.    The following paragraphs in this section summarize key provisions of the Bid Procedures, but are qualified in their entirety by reference to the actual Bid Procedures.

     a.    Participation Requirements.

        i.    An executed confidentiality agreement, as set forth in the APA, in form and substance reasonably acceptable to the Debtor.

        ii.    At the time of submission of the competing bid, written evidence of the financial capability of consummating the purchase of the Acquired Assets and the assumption of the Assumed Liabilities.

---

[3] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Bid Procedures attached hereto as Exhibit A, or the APA, as applicable.

iii.    The most current audited and latest unaudited financial statements (collectively, the "<u>Financials</u>") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of the Sale, Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure evidencing the Potential Bidder's ability to close the Transaction, the sufficiency of which shall be determined by the Debtor in its reasonable discretion.

iv.    Written acknowledgement and agreement that the sale of the Debtor's customer lists, customer data and other consumer privacy information shall be maintained in accordance with the Debtor's existing privacy and, if the Court ultimately determines appointment is appropriate, subject to and conform to the recommendations of the consumer privacy ombudsperson to be appointed pursuant to 11 U.S.C. § 332 (the "<u>Consumer Privacy Ombudsperson</u>") (to the extent that appointment of a Consumer Privacy Ombudsman is necessary) in connection with the transactions contemplated herein.

b.    <u>Qualified Bid</u>.

i.    <u>Modified APA</u>. A Bid shall include a black-lined copy of the APA (the "<u>Modified APA</u>") to show all changes requested by the Bidder, including those related to the Purchase Price; <u>provided, however,</u> that the terms of the Modified APA are substantially the same or better than the terms of the APA.

ii.    <u>Acquired Assets</u>. Each Bid shall be for all of the Acquired Assets.

iii.    <u>Contingencies</u>. A Bid may not be conditioned on obtaining internal approval or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the APA.

iv.    <u>Authorization to Bid</u>. A Bid shall include evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified APA.

v.    <u>Deposit</u>. Any person submitting a proposal for a competing Transaction shall provide a deposit to Debtor's counsel of at least $200,000, contemporaneous with the submission of its Qualified Bid.

DB02:9498035.4            069355.1001

      vi.      <u>Minimum Initial Bid Requirement</u>. Each Qualified Bidder's Bid shall have an initial minimum bid requirement that is $200,000 greater than the Purchase Price.

      vii.     <u>Other Evidence</u>. Each Bid must contain evidence satisfactory to the Debtor that the bidder is reasonably likely (based on availability of financing, experience and other considerations) to be able to timely consummate a purchase of the Acquired Assets if selected as the Successful Bidder.

c.     <u>Bid Deadline</u>. The deadline for submitting bids by a Qualified Bidder shall be May 17, 2010, at 12:00 NOON (ET) (the "<u>Bid Deadline</u>"). A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

d.     <u>Auction</u>. In the event that the Debtor receives at least one (1) Qualified Bid (other than the Stalking Horse Bidder) by the Bid Deadline, the Debtor shall conduct an auction (the "<u>Auction</u>") of the Acquired Assets to determine the highest and otherwise best bid with respect to the Acquired Assets. No later than May 17, 2010 at 4:00 p.m. (ET), the Debtor will notify all Qualified Bidders of (i) the highest or otherwise best Qualified Bid, and (ii) the time and place of the Auction.

e.     <u>Sale Hearing</u>. The Sale Hearing shall be conducted by the Bankruptcy Court on or before May 19, 2010.

15.     The Debtor expressly reserves the right to modify the relief requested herein. Moreover, the Debtor reserves the right, upon notice to all Notice Parties and those parties that have demonstrated an interest in bidding on the Acquired Assets, to: (a) waive terms and conditions set forth herein with respect to any or all potential bidders; (b) impose additional terms and conditions with respect to any or all potential bidders; (c) extend the deadlines set forth herein; (d) cancel the sale of the Acquired Assets and/or Sale Hearing in open court without further notice; and (e) amend the Bid Procedures as the Debtor may determine to be in the best interests of its estate or to withdraw the Motion at any time with or without prejudice.

## B.    Stalking Horse Protections

16.     The APA submitted by the Stalking Horse Bidder contemplates bid protections in the form of a Break-Up Fee in the amount of $112,000 (three percent (3%) of the Purchase Price) (the "<u>Break-Up Fee</u>") and an Expense Reimbursement up to $50,000 (the

"Expense Reimbursement," and together with the Break-Up Fee, the "Stalking Horse Protections"). The Debtor seeks to provide the Stalking Horse Protections in recognition of the Stalking Horse Bidder's substantial expenditure of time, energy, and resources, and the benefits to the Debtor's estate of securing a "stalking horse" or guaranteed minimum bid. The Stalking Horse Protections are required by the APA.

17.     By this Motion, the Debtor seeks authority to be able to award and, if required pursuant to the terms of the APA, to pay the Break-Up Fee and reimburse the Stalking Horse Bidder for reasonable and necessary expenses incurred in connection with the formation, negotiation and documentation of the APA. If approved, the Stalking Horse Protections will be paid to the Stalking Horse Bidder pursuant to the terms of the APA.

## C.     Notice of Auction

18.     The Debtor seeks to have the Auction scheduled for a date no later than May 18, 2010. Simply put, the value of the Acquired Assets will decline substantially if the sale process is not completed on an expedited basis, because such value is highly dependent upon the loyalty of employees and key customers which will undoubtedly move-on if ownership of the Acquired Assets is not rapidly transitioned.

19.     Not later than one (1) business day after the entry of the Bid Procedures Order, the Debtor will serve copies of the Sale Notice, substantially in the form attached hereto as Exhibit E (the "Sale Notice"), the Bid Procedures, and the Bid Procedures Order by mail, postage prepaid to: (a) all entities known to have expressed a *bona fide* interest in acquiring the Acquired Assets (by overnight mail); (b) counsel to the Committee; (c) the Office of the United States Trustee for the District of Delaware; (d) counsel to Gems Holdings Limited; (e) known entities holding or asserting a security interest in or lien against any of the Acquired Assets; (f) taxing authorities whose rights may be affected by a sale of the Acquired Assets; (g) all

government agencies required to receive notice of proceedings under the Bankruptcy Rules; and (h) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bid Procedures Order.

20.     The Debtor further requests, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, by 12:00 NOON (ET) on May 17, 2010; and (d) be served so as to be received by such date and time on: (i) counsel to the Debtor; (ii) counsel to the Committee; (iii) the Office of the United States Trustee; (iv) counsel to the Stalking Horse Bidder; and (v) all parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b).

**D.      Procedures to Determine Cure Amounts and Deadlines for Objection to Assumption and Assignment of the Purchased Contracts.**

21.     To facilitate and effect the Sale, the Debtor will be required to assume and/or assign the Purchased Contracts to the Stalking Horse Bidder, or as applicable, to the Successful Bidder. Given the need to quickly consummate the transaction, the Debtor seeks to establish (a) procedures for determining cure amounts through the closing date of the Sale (the "Cure Amounts"), and (b) the deadline for objections to the assumption and/or assignment of contracts and leases to be assumed and/or assigned in connection with the Sale (collectively, the "Cure Procedures").

22.     The Stalking Horse Bidder shall be assigned the Purchased Contracts set forth on Schedule 2 to the APA. The Debtor shall prepare and distribute to non-Debtor parties to the Purchased Contracts a notice, substantially in the form annexed hereto as Exhibit F (a "Cure Notice"), listing (i) the Purchased Contract(s), and (ii) the Cure Amount(s), if any. If the

Stalking Horse Bidder is not the Successful Bidder at the Auction, no later than one (1) business day after the Auction, the Debtor shall send a subsequent Cure Notice to all non-Debtor parties to executory contracts or unexpired leases to be assigned to the Successful Bidder that were not Purchased Contracts.

23.     To facilitate a prompt resolution of cure disputes and objections relating to the assumption and assignment of the Purchased Contracts, the Debtor proposes the following deadlines and procedures:

a.     The non-Debtor parties to the Purchased Contracts shall have until May 17, 2010 at 12:00 NOON (the "Contract Objection Deadline"), which deadline may be extended in the sole discretion of the Debtor, to object (a "Contract Objection") to (i) the Cure Amounts listed by the Debtor and to propose alternative cure amounts, and/or (ii) the proposed assumption and/or assignment of the Purchased Contracts in connection with the Sale; provided, however, if the Stalking Horse Bidder is not the Successful Bidder at the Auction, and the Debtor sends a Cure Notice to a non-Debtor party to a Purchased Contract, or if the Debtor otherwise amends the Cure Notice to add a contract or lease or to reduce the Cure Amount thereof, except where such reduction was upon mutual agreement of the parties, the non-Debtor parties thereto shall have until the commencement of the Sale Hearing to submit a Contract Objection (the "Amended Contract Objection Deadline").

b.     Any party objecting to the Cure Amounts or objecting to the potential assumption and/or assignment of such Purchased Contract(s), shall be required to file and serve a Contract Objection, in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Purchased Contract(s), as applicable, and/or any and all objections to the potential assumption and/or assignment of such agreements, together with all documentation supporting such cure claim or objection, upon the Notice Parties, so that the Contract Objection is received no later than 4:00 p.m. on the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable. Where a non-Debtor counterparty to a Purchased Contract files an objection asserting a cure amount higher than the proposed Cure Amounts (the "Disputed Cure Amount"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the consent of the Stalking Horse Bidder (or the Successful Bidder) of such consensual resolution, the Debtor shall promptly provide the Committee and the Stalking Horse Bidder (or the Successful Bidder) notice and opportunity to object to such proposed

069355.1001

resolution or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then such objection will be heard at the Sale Hearing or thereafter.

24.     Unless an objection to the assumption and assignment of a Purchased Contract is filed and served before the Contract Objection Deadline, all counterparties to the Purchased Contracts shall: (i) be forever barred from objecting to the proposed Cure Amounts and from asserting any additional cure or other amounts with respect to the Purchased Contracts, and the Debtor and Stalking Horse Bidder (or the Successful Bidder) shall be entitled to rely solely upon the proposed Cure Amounts set forth in the Cure Notices; (ii) be deemed to have consented to the assumption and assignment; and (iii) be forever barred and estopped from asserting or claiming against the Debtor or Stalking Horse Bidder (or the Successful Bidder) that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Purchased Contract, or that there is any objection or defense to the assumption and assignment of such Purchased Contracts.

**Basis for Relief**

A.     **The Proposed Sale is an Exercise of the Debtor's Sound Business Judgment and Should be Approved.**

25.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re*

*Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991).

26.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. *Abbotts Dairies*, 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, the Debtor submits that the decision to proceed with the Sale and the Bid Procedures related thereto are based upon its sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

27.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.

DB02:9498035.4                                                                       069355.1001

Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

28.     The Debtor submits that more than ample business justification exists to sell the Acquired Assets to the Successful Bidder pursuant to the Bid Procedures. The Debtor believes that a targeted sale process is most likely to achieve the highest and best price for the Acquired Assets. Simply stated, since the Debtor has begun, and will soon conclude, the cessation of its operations, the Acquired Assets will likely decline in value absent a prompt sale. Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtor's estate for the benefit of its stakeholders.

29.     The Sale Notice is designed to provide adequate notice to all potentially interested parties, including those which have previously expressed an interest in purchasing the

Acquired Assets. Indeed, the Debtor and its professionals have marketed the Acquired Assets, and have solicited the most likely interested competing bidders. Accordingly, the proposed Sale satisfies the second prong of the *Abbotts Dairies* standard.

30.     Moreover, the Bid Procedures are designed to maximize the value received for the Acquired Assets. The process proposed by the Debtor allows for a timely and efficient auction process given the circumstances facing the Debtor, while providing bidders with ample time and information to submit a timely bid and to perform diligence. The Bid Procedures are designed to ensure that the Acquired Assets will be sold for the highest or otherwise best possible purchase price. The Debtor is subjecting the value of the Acquired Assets to market testing and permitting prospective purchasers to bid on the Acquired Assets. The proposed Sale will be further subject to a market check through the solicitation of competing bids in a court-supervised Auction process, as set forth in the Bid Procedures. Accordingly, the Debtor and all parties in interest can be assured that the consideration received for the Acquired Assets will be fair and reasonable, and therefore the third prong of the *Abbotts Dairies* standard is satisfied.

31.     As discussed below, the "good faith" prong of the *Abbotts Dairies* standard is also satisfied here.

**B.     The Stalking Horse Bidder Should Be Granted the Protections of a Good Faith Purchaser.**

32.     The Stalking Horse Bidder should be granted the protections of a good faith Stalking Horse Bidder under section 363(m) of the Bankruptcy Code. That section reads, in pertinent part, as follows:

> The reversal or modification on appeal of an authorization under [section 363(b) or (c)] of a sale or lease of property does not affect the validity of the sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

16

11 U.S.C. 363(m).

33.     Although the Bankruptcy Code does not define "good faith purchaser," the United States Court of Appeals for the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *Abbotts Dairies*, 788 F.2d at 147; *see also Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490 (3d Cir. 1998). To constitute a lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the stalking horse bidder and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (*citing In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978). *See also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *Matter of Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (*quoting Rock Indus. Mach.*, 572 F.2d at 1998).

34.     The terms of the APA were negotiated at arms' length, without collusion, in good faith, and with the parties being represented by counsel. Aside from the Stalking Horse Bidder's role as one of the Debtor's prepetition vendors, there is no relationship between the Debtor and the Stalking Horse Bidder nor any of their officers and directors. Similarly, there are no agreements between the Debtor and the Stalking Horse Bidder other than the APA. Neither the Debtor nor the Stalking Horse Bidder has engaged in any conduct that would cause or permit the sale to the Stalking Horse Bidder to be avoided under section 363(m) of the Bankruptcy Code.

DB02:9498035.4                                                                                                              069355.1001

35.     Accordingly, the Debtor requests the Court to determine that the Stalking Horse Bidder has negotiated and acted at all times in good faith and, as a result, to be entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

**C.    The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, Encumbrances and Interests.**

36.     Section 363(f) of the Bankruptcy Code provides that a debtor in possession may sell property free and clear of liens, claims, encumbrances and other interests if any one of the following conditions is satisfied:

(1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2)    the [lienholder or claimholder] consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    the [lienholder or claimholder] could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

37.     Notably, section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any one of its five requirements will suffice to warrant approval of the Sale of the Acquired Assets by the Debtor free and clear of liens, claims, encumbrances and other interests. *See 11 U.S.C. § 363(f)*; *see also In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, *12 (Bankr. S.D.N.Y. Mar. 6, 1992); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (because section 363(f) is written in the disjunctive; a court may approve a sale "free and clear" provided that at least one of the subsections is applicable).

DB02:9498035.4     069355.1001

38.     The Debtor does not believe there are any material secured claims with respect to the Acquired Assets but, to the extent there are any such claims, the Debtor believes it is appropriate for the Acquired Assets to be sold free and clear of liens, claims, encumbrances and interests pursuant to section 363 of the Bankruptcy Code.  To that end, and for other reasons, the Debtor believes that, at a minimum, all holders of interests in the Acquired Assets could be compelled to accept a money satisfaction of their interests in legal or equitable proceedings in accordance with section 363(f)(5) of the Bankruptcy Code to the extent that such interests are sought to be discharged in the Sale Order.    Based upon the foregoing, the proposed Sale free and clear of liens, claims, encumbrances and interests (except as otherwise provided) will satisfy the requirements of section 363(f) of the Bankruptcy Code.

39.     Accordingly, the Acquired Assets should be transferred to the Stalking Horse Bidder free and clear of all liens, claims, encumbrances and interests.

**D.      Approval of the Stalking Horse Protections is Appropriate.**

40.     Approval of the Stalking Horse Protections are governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit Court of Appeals in *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999).  In *O'Brien*, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Thus, to be approved, bidding incentives must provide some benefit to a debtor's bankruptcy estate. *Id.* at 533.

41.     The Third Circuit identified at least two instances in which bidding incentives may benefit a bankruptcy estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not

have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtors and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect their true worth." *Id.*

42.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Stalking Horse Protections should be approved. The Break-Up Fee of $112,000, which is only three percent (3%) of the Purchase Price, and the Expense Reimbursement, which is capped at $50,000, are the product of extended good faith, arm's-length negotiations between the Debtor and the Stalking Horse Bidder, and are well within the range of bidder protections typically approved by this Court in similar circumstances. Indeed, the Stalking Horse Protections are fair and reasonable in amount, particularly in view of the Stalking Horse Bidder's efforts to date, the risk to the Stalking Horse Bidder of being used as a "stalking horse," and the return to this estate that the Sale will provide.

43.     Further, the Stalking Horse Protections already have encouraged competitive bidding, in that the Stalking Horse Bidder would not have entered into the APA without these provisions. The Stalking Horse Protections thus have "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited." *Id.* Similarly, the Stalking Horse Bidder's offer, which was formulated only after an extensive review of the Acquired Assets, provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Acquired Assets are] sold will reflect [their] true worth." *Id.* Finally, the mere existence of the Stalking Horse Protections permit the

Debtor to insist that competing bids for the Acquired Assets be higher or otherwise better than the Purchase Price, a clear benefit to the Debtor's estate.

44.     The Debtor therefore requests the Court to authorize payment of the Stalking Horse Protections pursuant to the terms and conditions of the APA.

**E.     The Assumption and Assignment of the Purchased Contracts Should Be Authorized.**

45.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.*, 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or

21

provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

46.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets) Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

47.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that

DB02:9498035.4                                                                                              069355.1001

is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a).

Provided that a bankruptcy court does not employ its equitable powers to achieve a result not

contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *See In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may

fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the

bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy

Code"); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986)

(noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever

equities a debtor may have in property for the benefit of their creditors as long as that protection

is implemented in a manner consistent with the bankruptcy laws").

48.     The Debtor respectfully submits that the proposed Cure Procedures are

appropriate and reasonably tailored to provide non-Debtor parties to the Purchased Contracts

with adequate notice, in the form of the Cure Notice, of the proposed assumption and/or

assignment of their applicable contract, as well as the proposed Cure Amounts, if applicable.

Such non-Debtor parties to the Purchased Contracts will then be given an opportunity to object

to such notice. The Cure Procedures further provide that, in the event an objection is not

resolved, the Court will determine related disputed issues (including any adequate assurance of

future performance issues).

49.     Accordingly, the Debtor submits that implementation of the proposed

Cure Procedures is appropriate in this case.

DB02:9498035.4

069355.1001

## F.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.

50.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that any order approving the proposed Sale and the assumption and assignment of the Purchased Contracts be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

51.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(g) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier provides that if an objection is filed and overruled and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

52.    As set forth in greater detail above, time is of the essence with respect to the Sale. To preserve the value of the Acquired Assets and to meet the timeline contemplated by the APA, it is critical that the Debtor closes the Sale as soon as possible after all closing conditions have been met or waived. In addition, due to the overhang of the chapter 11 case and the announcement of the wind-down of the Debtor's operations, the Debtor's customer base and

24

employee commitment is diminishing each day. Thus, the value of the Acquired Assets is necessarily diminishing.

53.     Accordingly, the Debtor hereby requests the Court to waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d) with respect to the Sale Order, so that it can be effective upon its entry without further costly delay.

## Notice

54.     Notice of this Motion has been given to: (i) the United States Trustee; (ii) counsel to the Committee; (iii) counsel to the Stalking Horse Bidder; (iv) all parties known or reasonably believed to have asserted a lien on any of the Acquired Assets; (v) the counterparties to each of the Purchased Contracts; (vi) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Acquired Assets; (vii) counsel to Gems TV Holdings Limited; and (viii) all parties that have requested personal notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtor submits that no further notice is required.

WHEREFORE, the Debtor respectfully requests that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: Wilmington, Delaware
April __28__, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
Kenneth J. Enos (No. 4544)
Robert F. Poppiti, Jr. (No. 5052)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

PROPOSED ATTORNEYS FOR DEBTOR
AND DEBTOR-IN-POSSESSION

DB02:9498035.4 069355.1001